1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF OHIO
2                EASTERN DIVISION

3                 - - - - -

4

5    UNITED STATES OF AMERICA,        )
                                      )
6                Plaintiff,           ) Case No. 1:18CR00022
                                      )
7            vs.                      )
                                      )
8    PHILLIP R. DURACHINSKY,          )
                                      )
9                Defendant.           )

10

11                - - - - -

12

13   TRANSCRIPT OF PROCEEDINGS HAD BEFORE THE HONORABLE

14    JUDGE SOLOMON OLIVER, JR., JUDGE OF SAID COURT,

15          ON WEDNESDAY, MAY 15TH, 2024,

16        COMMENCING AT 10:00 O'CLOCK A.M.

17                - - - - -

18

19

20

21   Court Reporter:          GEORGE J. STAIDUHAR
                              801 W. SUPERIOR AVE.,
22                            SUITE 7-184
                              CLEVELAND, OHIO 44113
23                            (216) 357-7128

24                - - - - -

25

2

1    APPEARANCES:

2       On behalf of the Government:

3          OFFICE OF THE U.S. ATTORNEY
           BY:  MATTHEW SHEPHERD, AUSA
4          801 West Superior Ave., Suite 400
           Cleveland, OH 44113
5

6       On behalf of the Defendant:

7          OFFICE OF THE FEDERAL PUBLIC DEFENDER
           BY:  DARIN THOMPSON,
8               CHRISTIAN GROSTIC, ASSISTANTS FEDERAL
                PUBLIC DEFENDER
9          750 Skylight Office Tower
           Cleveland, OH 44113
10

11                    - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2               (Case called.)

3               THE COURT:  Good morning.  Will counsel for

4   the United States introduce himself for the record?

5               MR. SHEPHERD:  Matthew Shepherd on behalf of

6   the United States.

7               Good morning, your Honor.

8               THE COURT:  Good morning.

9               And will counsel for Phillip R. Durachinsky

10  introduce himself for the record, themselves.

11              MR. THOMPSON:  Good morning, your Honor.

12  Darin Thompson with the Federal Public Defender.  To my

13  right is Phillip Durachinsky, and to his right is

14  co-counsel, Christian Grostic.

15              THE COURT:  Thank you.  I asked my courtroom

16  deputy to set this hearing because I received word

17  through the Marshal Service that that bags of material I

18  guess and information that was stored for Mr. Durachinsky

19  was destroyed at the county jail, the Mahoning County

20  Jail, and I obviously felt the need the to make further

21  inquiry.

22              The Marshal has assured has shared with us

23  information that they have, and we have received other

24  submissions from the Mahoning County Jail relative to the

25  matter.

1          The parties will recall that Mr. Durachinsky

2    has certain information, which he kept there at the

3    Mahoning County Jail.  He had indicated over time that

4    those papers were important to him and others materials.

5          And so I had asked the Marshals to make sure

6    that they communicated to the Mahoning County facility

7    that those materials were to be maintained for him.

8          And the Marshals indicated that they did

9    make that known, make known to the Mahoning County jail

10   those materials were not to be destroyed, but they were

11   to be maintained.

12         Now, the reason this came up was that I sent

13   Mr. Durachinsky away for a competency determination.  So

14   that was -- the question was what would happen to his

15   other documents and other possessions?

16         And so the order was that they should be

17   maintained.

18         And then he came back to the facility, but

19   after I made the determination that he was not competent

20   to stand trial, I had him committed to the custody of the

21   Attorney General so that they could make a determination

22   whether there was substantial probability in the

23   foreseeable future whether he would attain the capacity

24   to go forward.

25         That latter evaluation has taken place, but

1    the report has not yet been received.

2                Meanwhile, Mr. Durachinsky was sent back,

3    and he is back, as I understand it, at the Mahoning

4    County Jail.  It was in that context of his coming back

5    that we were notified that his materials were no longer

6    available, and they had been destroyed

7                Mr. Durachinsky's case was filed quite a

8    long time ago.  It is complex.  It has a range of charges

9    of different types, serious charges, and he has had a

10   number of counsel, and he has had expert assistance

11   during the course of the trial.

12               And we've had also the interruption because

13   of the competency evaluation and then competency, later

14   competency evaluation to determine whether he could

15   attain the capacity to proceed.

16               He has been very involved in his trial, not

17   his trial, but his representation, sometimes writing

18   letters to the Court; other times urging his counsel to

19   take certain positions.

20               So I just make that as an observation that

21   he seems to have been among the most active Defendants

22   that I have had in Court before me.  It is not a positive

23   or negative comment, but it is just a factual one.

24               So I just wanted to -- I felt the necessity

25   to make a record because this was an important matter,

1    because I was careful to try to make sure that those

2    papers were preserved; they were not.

3            And so I just need to -- I can't be informal

4    about this was my feeling.  It is not a hard feeling

5    toward anybody, or it is just -- I can't proceed without

6    having a record, a record that is more than e-mails and

7    so forth.

8            I don't intend to spend a long period of

9    time.  I don't intend to make this a hearing where I call

10   all of the possible people who know something about this.

11           My thought was I would start by just

12   confirming with the Marshal Deputy what he knows and what

13   he understands as it relates to communicating this to

14   Mahoning, any other relevant information he has, and I

15   would be interested in hearing from a responsible

16   supervisor as to matters and what they know.

17           I understand that Officer Morlan is involved

18   in a disciplinary hearing.  So I don't -- currently.  I

19   won't say I won't change my mind -- I don't currently

20   intend to ask him, put him under questioning, but I won't

21   say it won't happen, but I would rather not do that.  So

22   that's how I would like to proceed, and I ask Marshal

23   Matt Crossman to come forward.

24           DEPUTY CROSSMAN:  Good morning, Judge.

25           THE COURT:  Good morning, how are you doing?

1          DEPUTY CROSSMAN:  Not too bad.  How about

2    yourself?

3          THE COURT:  Oh, I doing all right.  I know

4    you've already communicated my order to Mahoning but just

5    go ahead and tell me what took place, what you know from

6    your end.

7          DEPUTY CROSSMAN:  Absolutely, Judge.  So on

8    June 7th, 2023, we were in receipt of your order

9    regarding the property.  On June 9th, 2023, investigative

10   analyst, Jeff Alexiak, sent that order to Mahoning

11   County.  The Defendant then went away on his study on

12   June 27th.

13          On August 3rd, 2023, Attorney Thompson had

14   requested confirmation that none of the property was

15   destroyed.  So on August 3rd, I resent the order to

16   Mahoning County and asked for confirmation.

17          On August 7th, Captain Koontz confirmed that

18   the property was secured in the property room.  The

19   Defendant again left for a study on 12-27-2023, and then

20   May 7th, now 2024, Captain Koontz called me and then

21   e-mailed me regarding that the property was mistakenly

22   destroyed, and then the following day is when I related

23   to your chambers.

24          THE COURT:  Thank you.  That would have been

25   on May 8th?

1          DEPUTY CROSSMAN:  May 8th, yes, sir.

2          THE COURT:  All right.  I may call you back,

3   but I just wanted to cover that part first.

4          Thank you.

5          DEPUTY CROSSMAN:  Yes, sir.  Thank you.

6          THE COURT:  All right.  Now, who would speak

7   on behalf of Mahoning County?  Would that be Captain

8   Koontz or Lieutenant Dugan?

9          CAPTAIN KOONTZ:  That would be captain,

10  myself.

11         THE COURT:  All right.  Can you come to the

12  podium, please.  Good morning.

13         CAPTAIN KOONTZ:  Good morning, your Honor.

14         THE COURT:  State your full name for the

15  record.

16         CAPTAIN KOONTZ:  Kenneth Koontz.  I am a

17  captain with the Mahoning County Sheriff's Office.

18         THE COURT:  How long have you been there?

19         CAPTAIN KOONTZ:  I have been there 33 years

20  this year.

21         THE COURT:  What are your responsibilities

22  generally?

23         CAPTAIN KOONTZ:  I am the jail administrator

24  for the corrections division.

25         THE COURT:  All right.  And can you

1    first verify, if you can, that Mahoning did receive

2    information from the Marshal's office as Marshal Crossman

3    indicated?

4                    CAPTAIN KOONTZ:  Yes, we did.

5                    THE COURT:  And he told you about my order

6    that the papers should be maintained?

7                    CAPTAIN KOONTZ:  Correct.

8                    THE COURT:  And you followed those -- when I

9    say "you," I don't mean you -- but Mahoning County

10   followed those orders up until the time the papers were

11   destroyed.  Is that right?

12                   CAPTAIN KOONTZ:  Yes.  We took steps to make

13   sure it was secured in the property room, and we always

14   have bags of property from inmates that left.

15                   What makes this unique is because we marked

16   the property with Inmate Durachinsky's name on it and

17   said "do not destroy per Lieutenant Dugan."

18                   He is the one that I assigned the detail to

19   when I received the Court order.

20                   THE COURT:  And what's in that room where

21   his property was stored.

22                   CAPTAIN KOONTZ:  Yeah, it is all inmate

23   property.  Some property belonged to inmates that were

24   still there, and other property is inmates that have left

25   the facility.

1          THE COURT:  And how do you distinguish

2   between those three kinds of property when you --

3          CAPTAIN KOONTZ:  The property that the

4   inmates are still there is marked in a -- it is kept in a

5   property bag.  It is a black and white bag, like a mesh

6   bag.

7          It hangs on a carousel similar to a dry

8   cleaner, and everything is inventoried in there.  When an

9   inmate leaves and they come out and takes their property

10  with them for whatever reason, it is placed in a paper

11  bag and placed on the shelf.

12          THE COURT:  Okay.  So when one walks into

13  the room, one can distinguish by how the property is

14  kept, whether it is property of an inmate that is there,

15  whether it is property or someone like Mr. Durachinsky

16  whose property is marked "do not" -- what did it say "do

17  not" --

18          CAPTAIN KOONTZ:  "Do not destroy."

19          THE COURT:  And then what about the property

20  that is left behind by inmates?

21          CAPTAIN KOONTZ:  We ended up -- we destroy

22  that after a while.  Everything except for the valued

23  property, watches, jewelry, that kind of thing, we keep

24  that, and we pursue a Court order to have that auctioned

25  off years later.

1          THE COURT:  Now, how many bags of property

2    were for Mr. Durachinsky?

3          CAPTAIN KOONTZ:  We are actually unsure

4    about how many bags were there.  Some people say there

5    was three.  That's probably like the common number, three

6    bags of properties.

7          THE COURT:  Okay.

8          CAPTAIN KOONTZ:  But there was originally

9    five bags, but apparently, somebody said there was only

10   three.

11         THE COURT:  Did you -- have you seen the

12   bags yourself?

13         CAPTAIN KOONTZ:  Yes.

14         THE COURT:  You seen them marked?

15         CAPTAIN KOONTZ:  Yes.

16         THE COURT:  Okay.  And we can take hearsay

17   here today.

18         Captain -- I am sorry, the Lieutenant Dugan,

19   he saw the bags before?

20         CAPTAIN KOONTZ:  Yes.

21         THE COURT:  He saw them when they were

22   marked "do not destroy"?

23         CAPTAIN KOONTZ:  That's correct.

24         THE COURT:  And are there other people --

25   who works the property room and would make decisions

1    about which things would be destroyed and which ones

2    won't?

3              CAPTAIN KOONTZ:  It is really kind of crazy

4    because of our collective bargaining agreements, we have

5    daily job bidding, so everyday there is somebody

6    different that works in the property room depending on

7    their seniority.

8              THE COURT:  Okay.  So the person who works

9    the property room today and knows that the property says

10   "do not disturb," once they know that, they don't come

11   back the next day or the next day and work that room.

12             CAPTAIN KOONTZ:  I'm sorry, your Honor.

13             THE COURT:  I am just trying verify what you

14   said.  Maybe I didn't ask the question very clearly, but

15   if I work the property room and I see that the bags say

16   "do not destroy," when I come back the next day, I don't

17   have to give it any thought at all because I have seen

18   those bags.

19             CAPTAIN KOONTZ:  Exactly.

20             THE COURT:  But it may be somebody is going

21   to walk into the property room who has never worked it

22   before, and they have to familiarize themselves with

23   what's there, correct?

24             CAPTAIN KOONTZ:  That's correct, yes.

25             THE COURT:  But were the bags marked clearly

1    -- clearly marked "do not destroy"?

2            CAPTAIN KOONTZ:  Yes.  As I remember the

3    bags, it was brown paper bags, and they were marked with

4    black Sharpie marker on the bag "do not destroy per

5    Lieutenant Dugan."

6            THE COURT:  Okay.  How did you find out that

7    the property was destroyed?

8            CAPTAIN KOONTZ:  When I came to work that

9    morning, one of the -- Lieutenant Dugan and another

10   sergeant advised me that the bags were destroyed on night

11   shift a couple days previous to me reporting for work,

12   and they had checked the dumpster from what I understand.

13   The dumpster had already been emptied twice.  It is

14   emptied every night.

15           THE COURT:  And once the dumpster is emptied

16   where does it go, landfill or what?

17           CAPTAIN KOONTZ:  Yes.  I would assume it

18   would go to a landfill.

19           THE COURT:  Do people -- as people rotate

20   into the property room, are they given instructions about

21   property in the room?

22           CAPTAIN KOONTZ:  Yes.  There is policies

23   they have to follow, but usually when somebody works

24   there, they are familiar with it, how things work in the

25   property room.

1          THE COURT:  Does an individual person have
2    the authority to destroy property?
3          CAPTAIN KOONTZ:  They would have the
4    authority to destroy property as long as it is not valued
5    property.  Our policy says that anything over 30 days is
6    destroyed.  We usually don't do that because people have
7    a hard time getting to the jail, so it is usually 60 to
8    90 days, after that we do destroy it.
9          THE COURT:  So someone who destroys the
10   property, they would have to inquire as to whether the
11   property has been there 60 days or 90 days, right?
12         CAPTAIN KOONTZ:  Correct.
13         THE COURT:  And this is for property where
14   persons have left the facility?
15         CAPTAIN KOONTZ:  Yes, that's correct.
16         THE COURT:  With no instructions to maintain
17   their property?
18         CAPTAIN KOONTZ:  Correct.
19         THE COURT:  But so there is authority for an
20   individual in the property room to destroy property,
21   which -- for which there is no instruction; in other
22   words, if an inmate is no longer there and for a period
23   of 30 to 60 days?
24         CAPTAIN KOONTZ:  Yes.  And it would sit on
25   the -- it would be the same thing, it would be in a paper

1    bag sitting on the shelf with the inmate's name on it and

2    when they left the facility.

3                 THE COURT:  But that wasn't the status of

4    Mr. Durachinsky's bag.

5                 CAPTAIN KOONTZ:  No.  No, your Honor.  His

6    was the only bags that I can remember that were marked

7    "do not destroy."

8                 THE COURT:  And they were marked you say in

9    letters sufficient so that anyone looking at the bag

10   would have to read them if their eyes were open.

11                CAPTAIN KOONTZ:  Yes, that's correct.

12                THE COURT:  And it is your feeling that once

13   they left and thrown in the dumpster, that after a period

14   of two or three days, there would be no place to go and

15   look for them?

16                CAPTAIN KOONTZ:  That's correct.

17                THE COURT:  All right.  I am going to see if

18   either counsel has any questions that would further

19   develop the record if they feel I have missed anything.

20   Mr. Thompson.  Well, either way.

21                MR. THOMPSON:  Did you speak to the deputy

22   who destroyed the property?

23                CAPTAIN KOONTZ:  Yes.

24                MR. THOMPSON:  What explanation did he give

25   for how this happened?

1          CAPTAIN KOONTZ:  At first he said the

2  property wasn't marked.  But after the short

3  investigation, finding out that other people that worked

4  the property room noticed that it was marked "do not

5  destroy per Lieutenant Dugan.

6          MR. THOMPSON:  Okay.

7          CAPTAIN KOONTZ:  And he does have a

8  disciplinary hearing coming up I think next week.

9          MR. THOMPSON:  Are there cameras inside that

10  property room?

11          CAPTAIN KOONTZ:  No, sir.

12          MR. THOMPSON:  And you indicated there

13  hasn't been a prior circumstance, which property has been

14  marked "do not destroy"?

15          CAPTAIN KOONTZ:  No, not that I can

16  remember.

17          MR. THOMPSON:  You are not certain how

18  many bags we are talking about, whether it is three or

19  five?

20          CAPTAIN KOONTZ:  No.  I am unsure whether it

21  is three or five.

22          MR. THOMPSON:  Was the property inventoried

23  before it was put into storage?

24          CAPTAIN KOONTZ:  I don't believe so.

25          MR. THOMPSON:  The notes in the property

1    that were in the property, I assume they were never

2    scanned into electronic form?

3                    CAPTAIN KOONTZ:  No.  The only thing that we

4    still have are his -- we have three -- I believe there is

5    three disks, I am not sure, might be just two disks of

6    his discovery that was sent from one of his attorneys.

7    That was kept somewhere separate than the property room.

8                    MR. THOMPSON:  One moment, your Honor.

9                    THE COURT:  All right.

10                   (Pause.)

11                   MR. THOMPSON:  I don't have anything else at

12   this point, your Honor.  Thank you.

13                   THE COURT:  All right.  Mr. Shepherd?

14                   MR. SHEPHERD:  Yes, your Honor.  I just have

15   one thing I wanted to clarify.

16                   Captain Koontz, when this property was

17   destroyed, was that of like a plan -- "inventory" is the

18   wrong word -- but a plan like destruction of excess

19   property, like an annual cleaning out or anything?

20                   CAPTAIN KOONTZ:  Yeah, it doesn't happen

21   annual; it happens probably about once a month maybe.  If

22   somebody has been there -- the policy says after 30 days.

23   And it is in the inmate handbook, and we usually give

24   them a little extra time because I know sometimes

25   families come down, and it is usually 60 days or 90 days,

1    and then it is just a rotation?

2                     If somebody is gone that long, the property

3    is usually destroyed.

4                     MR. SHEPHERD:  So is that just -- I guess

5    what I am getting at, so the person on night shift, that

6    deputy, he is destroying property like that, just sort of

7    a regular part of the duties of the deputy on night

8    shift?

9                     If there is extra time, whoever is in charge

10   of the property room -- if there is extra time -- they go

11   check and see what can be destroyed, or is this like,

12   you know, it is the first of the month.  We go look in

13   the property room and get rid of any excess property that

14   has been there 90 days?

15                    CAPTAIN KOONTZ:  No, it just occurs.

16                    MR. SHEPHERD:  So it is just one of the

17   duties of a person who might be there?

18                    CAPTAIN KOONTZ:  Yes.

19                    MR. SHEPHERD:  They might not have time, but

20   on another night they look and see if there is extra

21   property to be taken care of?

22                    CAPTAIN KOONTZ:  Correct.

23                    MR. SHEPHERD:  That's all I said, your

24   Honor.  Thank you.

25                    THE COURT:  You say, sir, that it said "do

1    not destroy," and then it says "per Lieutenant Dugan"?

2                    CAPTAIN KOONTZ:  Yes.

3                    THE COURT:  So it clearly sets out that the

4    order "do not destroy" was pursuant to a person who had

5    authority to do that?

6                    CAPTAIN KOONTZ:  Yes.

7                    THE COURT:  Because Lieutenant Dugan is the

8    person --

9                    CAPTAIN KOONTZ:  Yes.

10                    THE COURT:  -- that would be in charge of

11    the overall property room.

12                    CAPTAIN KOONTZ:  That's correct.  He was the

13    one that I assigned the detail to when we received your

14    Court order.

15                    THE COURT:  So if someone saw "do not

16    destroy per Lieutenant Dugan, they would know what that

17    meant.

18                    CAPTAIN KOONTZ:  Yes.

19                    THE COURT:  Because they would know the

20    lieutenant would be the person over them and over the

21    room?

22                    CAPTAIN KOONTZ:  Correct.

23                    THE COURT:  -- had authority to put that

24    on.

25                    CAPTAIN KOONTZ:  That's correct.  So any

1    normal person you would think would just call Lieutenant
2    Dugan the next day and ask him why does it say "do not
3    destroy"?
4              THE COURT:  All right.  That's all I have
5    for you right now.
6              CAPTAIN KOONTZ:  Okay.  Thank you, your
7    Honor.
8              THE COURT:  Thank you.  Let me just see if
9    the Marshal -- I am not suggesting you do -- if Marshal
10   Crossman has any additional comments.
11             DEPUTY CROSSMAN:  No, sir.
12             THE COURT:  All right.  Like I said before,
13   because Officer Morlan is facing a disciplinary hearing,
14   I have decided that I would not put him on here.  I am
15   not saying what I will do going forward, if anything.  I
16   am not making a commitment about that.
17             But today I think the better course is to
18   let him go through that disciplinary proceeding, and I
19   don't want to have anything that he would want to say
20   there preempted by what he might say here.  I want to
21   give him a chance to have a fair and full-blown hearing
22   on these matters within the Mahoning County system.
23             Counsel, if there is nothing further that we
24   need from Mahoning at this time, I would be prepared to
25   dismiss them, and then we will proceed with a brief

1   discussion.

2           MR. THOMPSON:  Sorry, your Honor.

3           Before we excuse them, can we just get

4   clarification of what exact day the property was

5   destroyed?

6           THE COURT:  All right.  The lieutenant get

7   that to us, Captain.

8           CAPTAIN KOONTZ:  Yes.  I am looking now.

9           (Pause.)

10           CAPTAIN KOONTZ:  Sorry, your Honor.  I am

11   trying to find the right paper here.

12           THE COURT:  That's all right.  Take your

13   time.

14           CAPTAIN KOONTZ:  So it May 6th of 2024.

15           THE COURT:  May 6th?  All right.

16           Just one moment.  Let me see if there is

17   any --

18           MR. THOMPSON:  Do you know, is it correct

19   Mr. Durachinsky got back on May 7th.  Is that accurate,

20   do you know?

21           CAPTAIN KOONTZ:  I don't know when he came

22   back, but it was destroyed on May 6th.  That's what is

23   written down by Deputy Morlan when he destroyed it.

24           THE COURT:  All right.  Mr. Shepherd

25   anything further?

1    MR. SHEPHERD:  No, your Honor.

2    THE COURT:  All right.  Thank you for coming

3    and being here.  You understand my reason for calling

4    you.

5    CAPTAIN KOONTZ:  Yes.

6    THE COURT:  I had issued an order because I

7    thought it was important to do so, and I didn't think it

8    would interfere with jail things, and I didn't try to

9    oversee that, but this was a particular case that I felt

10   the request made was reasonable I would say.  I would say

11   not required but a reasonable request.

12   CAPTAIN KOONTZ:  Yes.  And I just want to

13   apologize to the Court and the Government for not

14   following your order, your Honor.

15   THE COURT:  Well, I appreciate that.

16   We have got now -- I am going to let you go.

17   We have got to figure out now kind of our steps going

18   forward.  All right.  You are excused.

19   CAPTAIN KOONTZ:  Thank you.

20   THE COURT:  And Deputy Crossman, you can

21   remain if you wish, but you are free to go also.

22   CAPTAIN KOONTZ:  Thank you, sir.

23   THE COURT:  All right.  First, let me just

24   indicate that I received a request from the person

25   writing up the evaluation in regard to Mr. Durachinsky

1    where there will be a recommendation as to whether he can

2    be restored to competency.  The person requested an

3    extension of time until the end of this month.  So that's

4    just the latest news on that.

5                    I don't know what date Mr. Durachinsky came

6    back, but I was informed that he was back, and second --

7    well, let me ask you, Mr. Thompson, they talked about

8    three disks of discovery that you or one of the attorneys

9    provided.

10                    Are you familiar with what that is?

11                    MR. THOMPSON:  The disks were provided by

12    prior counsel, your Honor.

13                    THE COURT:  Was what?

14                    MR. THOMPSON:  Was provided by prior

15    counsel.  I am not certain exactly what is on them.

16                    THE COURT:  Okay.  Does Mr. Durachinsky know

17    what's on them?

18                    THE DEFENDANT:  Yes, your Honor.  I believe

19    one disk was an initial discovery disk provided early on

20    after indictment.  I believe another disk was logs from

21    the laptop that we requested later on that year, and I

22    think a third disk might have been a copy of transcripts

23    from the suppression hearing.

24                    THE COURT:  Okay.  And you would be able to

25    get those back, whatever is there?

1    THE DEFENDANT:  Yeah.  If those were lost,

2    presumably those could be recovered.

3    THE COURT:  Now, can you -- Mr. Thompson, I

4    am going to ask him these questions.

5    Is that okay?

6    MR. THOMPSON:  Yes, your Honor.  I know

7    Mr. Durachinsky has things he wants to say to the Court

8    as well.

9    THE COURT:  I know.  But I just want to make

10   a record in terms of how many bags he had, what was in

11   the bags if he recalls and so forth, so that kind of

12   thing.

13   So this is just factual information about

14   that.  It is not about the case or anything that can be

15   inferred to be related to the merits of the case.  That's

16   how I view it.

17   Is that --

18   MR. THOMPSON:  Yes, your Honor.  We are

19   actually hoping to put that kind of information on the

20   record today.  Thank you.

21   THE COURT:  Mr. Durachinsky, how many bags

22   were there?

23   THE DEFENDANT:  I don't know specifically.

24   What I do remember is, when I returned to Mahoning back

25   in November, I went through the property with a deputy

1    before they would let me bring it back up into

2    population, and I believe there were three brown bags,

3    which we left down there after I had taken my legal

4    material and most of the commissary that I had.

5            And so I believe those three brown bags

6    while I was still back at Mahoning back in the fall

7    contained my numerous books.  Some of the paperwork,

8    which they withheld from population when I first got

9    there, because it came from another jail as well as I

10   think some clothing -- yeah, my clothing -- that I was

11   not allowed to bring back into population because, you

12   know, it has colors on it.

13           When I left in December, I remember having

14   to quickly pack up property into, I believe, two black

15   garbage bags, and I remember telling the deputies that I

16   can't take that property with me, and that we have a

17   court order for them to hold it.

18           So I was able to get Lieutenant Dugan's

19   attention because he was walking around that morning, and

20   he said he would take care of it and presumably there

21   would have been the three brown bags that were there

22   while I was there last fall, plus potentially two other

23   bags containing however they stored those two black

24   garbage bags.  So there may have been five total.

25           THE COURT:  Books, what kind of books did

1    you have?

2                    THE DEFENDANT:  Primarily text books.

3                    THE COURT:  How many do you think?

4                    THE DEFENDANT:  I have gone over this with

5    my mother.  She checked her records, and so it appears

6    that I had about 20 books that had been sent into

7    Mahoning as well as four books, which were left in

8    property, because they came with me from the previous

9    jail.

10                   THE COURT:  You had that many books?

11                   THE DEFENDANT:  Yes, your Honor.

12                   THE COURT:  Would those be in one brown bag,

13   or what kind of bag would that be?

14                   THE DEFENDANT:  I think when we had stacked

15   them, I think I had combined -- the way we ended up doing

16   it was putting half of my legal paperwork on the bottom

17   of each of two bags and then I think placing books on top

18   of that so that the bags were stable.

19                   THE COURT:  Yeah, because 20 books, that's

20   some heavy weight.

21                   THE DEFENDANT:  Yeah.  But I had been at the

22   jail for four years at that point, and you know, I like

23   having reference material to keep learning from and to

24   use for my own projects that I work on.

25                   THE COURT:  You say "projects" that you work

1    on.  Unrelated to your case?

2            THE DEFENDANT:  Yes, your Honor.

3            THE COURT:  And I am not asking you for any

4    details, what other kind of projects do you work on that

5    require books?

6            THE DEFENDANT:  So I actually have an

7    overview of some of this prepared to go over what was

8    lost.  So for instance, a large project of mine has been

9    related to stocks in investing.  So a decent number of

10    those textbooks that I had were related either to

11    quantitative finance or to things like day trading or

12    just general information on how the stock market works.

13            THE COURT:  So those are things that you did

14    that occupied your time when you were there?

15            THE DEFENDANT:  Yes, your Honor.

16            THE COURT:  And clothing, how much clothing

17    was there, what kind?

18            THE DEFENDANT:  So I had dress clothes,

19    which I did take with me to Chicago, which I then had to

20    mail out when I got there.  There was not much in the

21    form of clothing.  It was probably about a few sets

22    of whites, and Mahoning on Monday did replace much of

23    the small amounts of commissary and clothing that I

24    lost.

25            THE COURT:  How did they replace that?

1          THE DEFENDANT:  They -- I believe they just

2     got it from commissary.  So for instance, there were two

3     white T-shirts.  Well, there was one white T-shirt and a

4     thermal top that was gone, and so they said they didn't

5     have the thermal top, but they gave me two white

6     T-shirts.  And actually, the T-shirt I am wearing is one

7     of those.

8          They also gave me three pairs of socks to

9     replace the three pairs of socks that were lost.

10         THE COURT:  You didn't lose much in the way

11    of clothing?

12         THE DEFENDANT:  No.  Those have been

13    replaced, similarly basic necessities like a wash rag and

14    shower shoes, they replaced those on Monday.  They also

15    gave me writing pads and manila envelopes, which had been

16    lost.

17         THE COURT:  Okay.  And you told them

18    that you had lost those, those things were in the

19    materials?

20         THE DEFENDANT:  Yeah.

21         THE COURT:  And they sought to replace what

22    they could?

23         THE DEFENDANT:  Yes.  Captain Koontz told me

24    to make a list, and so I made a list of non replaceable

25    property, other than food and books.

1          THE COURT:  Okay.  And when you went away

2    for the competency hearing, did you take any materials

3    with you or leave with family members.

4          THE DEFENDANT:  No.  When I went away to the

5    competency evaluation, they don't let us take any

6    material.  When I left over the summer, I tried to take a

7    single sheet of paper with some things that I was working

8    on, and the deputies took it out of my pocket and threw

9    it away because they said the Marshals don't allow

10   paperwork to go with you.

11         THE COURT:  So you didn't take anything with

12   you either time?

13         THE DEFENDANT:  No.  Only my clothing that I

14   was wearing.

15         THE COURT:  And you stored things at

16   the jail.  You didn't store anything with family

17   members?

18         THE DEFENDANT:  No.

19         THE COURT:  Okay.  Now, let's get back to

20   what was in the bags.  The clothing you talked about and

21   sought to replace that, and you had a lot of books mostly

22   related to day trading and stock trading.

23         Did you have other books relating to matters

24   pertaining to the case?

25         THE DEFENDANT:  No.  There was a generic

1     book, which someone had given me on legal arguments.

2           THE COURT: Yeah.

3           THE DEFENDANT: Okay.

4           THE COURT: But not directly relevant to the

5     charges?

6           THE DEFENDANT: No. None of the books were

7     directly relevant to this case specifically.

8           THE COURT: All right. Now, what else did

9     you have in your bags?

10           THE DEFENDANT: So I had a very large amount

11     of paperwork, both paperwork related to the case as well

12     as paperwork related to projects I was working on.

13           THE COURT: Okay. I am concerned about

14     everything that was destroyed because I told them not to

15     do it, but I am particularly interested in any paperwork

16     -- what kind of paperwork did you have that was related

17     to the case?

18           THE DEFENDANT: It might be best for me to

19     read what I prepared.

20           So I have lost thousands of hours worth of

21     organized research notes from case law for numerous

22     issues in this case. For instance, our motion to

23     dismiss, the original indictment for failure to state an

24     offense; made a number of legal arguments based on my own

25     research over the years, filtered and refined by counsel.

1          THE COURT:  Let me ask you about that.  I

2     don't mean to keep you from putting on the record what

3     you have in mind.

4          Notes related to my past legal rulings, is

5     that what you are talking about?

6          THE DEFENDANT:  No.  These are notes related

7     to my own research, some of which has been incorporated

8     into motions, which have resulted in rulings but much of

9     which is still -- would still be relevant.

10          So for instance, when I would spend time

11     researching case law, I would try to organize little

12     tidbits from cases based on the topics and subtopics, and

13     I would also make notes regarding potential legal

14     strategies and include citations and quotes directly

15     relevant to those.

16          THE COURT:  Okay.  And so you kept a lot of

17     notes?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  And those would have been about

20     a bag's worth?

21          THE DEFENDANT:  Although it was split up

22     into the two bags, but then they had books on top of it.

23     I believe you could fit all of my legal paperwork into a

24     large stack of paper that would fit in a large brown bag.

25          THE COURT:  Okay.  So you could get at least

1    that in a brown bag, maybe more?

2              THE DEFENDANT:  Yeah, so about a couple feet

3    of paper maybe.

4              THE COURT:  And so a lot of it -- I am just

5    trying to clarify -- a lot of it had to do with your own

6    research, musings, thought process about legal issues in

7    the case?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  And you had -- tell me if I am

10   wrong because I am not trying to put words in your mouth

11   -- you shared your thoughts and research when

12   appropriate, where you thought appropriate, when you

13   thought an issue that was coming up or an issue to alert

14   lawyers to, you made them aware of that.

15             THE DEFENDANT:  Yes, your Honor.  I would

16   try to bring up issues and try to quote from case law

17   where I felt relevant using my notes as reference.

18             THE COURT:  Yeah.  And how do you do your

19   legal research?

20             THE DEFENDANT:  So the first couple of years

21   I was locked up on this case, months after I had been

22   arrested, I started to realize that I am going to have to

23   take this case seriously to understand what's going on.

24             And so I got in the habit of going to the

25   law library at the Northeast Ohio Correctional Center

1    virtually every chance I could get throughout the day.

2                    And so there I was able to browse -- browse

3    LexisNexis case law that had been preloaded on those

4    computers.  I was able to organize snippets of case law

5    in word processor document, which I had printed out at

6    various times and brought with me when I was moved from

7    there.

8                    I would also review discovery on those

9    computers, and I was able to then research case law that

10   might be relevant to that discovery there.  When I was

11   moved from Northeast Ohio Correctional Center, Cuyahoga

12   County eventually set up a computer with LexisNexis.

13                   However, the majority of the last four or

14   five years I have been at Mahoning, and so initially they

15   had Akron law students coming in who I would ask to print

16   out case law.  Primarily back then it was preparing for

17   the suppression hearing.

18                   Around the time of the Pandemic, they

19   brought in tablets and kiosks, which is now their law

20   library, so they have an app, which allows us to browse

21   case law.

22                   THE COURT:  You are allowed to do that

23   now?

24                   THE DEFENDANT:  Yes.  I am able to browse

25   case law on the tablets at Mahoning County.

1          THE COURT:  Now, there are a range of issues

2   that have come up in the course of your case, and you

3   had, of course, lawyers representing you.  And I

4   understand you are the person who is faced with, you

5   know, the case and possible penalties, but the lawyers

6   have had interaction with you.  You may have some

7   thoughts about that interaction.

8          They filed motions for you.  I have ruled on

9   them.

10          Now, I understand the need -- your felt need

11  for having your notes and papers.  And I truly was trying

12  to preserve those for you, not because I felt like the

13  law required me to do it, but it felt like the right

14  thing to do.  So I wanted you to have those.

15          But what -- you have a range of issues that

16  you felt that going forward you need to address for which

17  you don't have papers.

18          THE DEFENDANT:  Yes, your Honor.

19          So for things affecting the case, I have

20  already mentioned my research related to case law because

21  there are still more motions that I would have wanted the

22  file, and those notes I believe would have been relevant

23  also for appeals of these issues later on.  In attempting

24  to re-do all this research would potentially take years,

25  cause more delay.

1          I also lost copies of my written

2    correspondence with my attorneys as well as to members of

3    the Court and the Government and for continuing FOIA

4    request related to this case.

5          So I am hoping that all seven years of

6    this still exists out there, and that my past attorneys

7    will remember which documents they have sent me in the

8    past.

9          THE COURT:  Well, you may not need all the

10   documents.  You may want them, but you know, if there are

11   particular ones, you have to think about those.  We can't

12   recreate everything that you had there, and I understand

13   that would be desirable for you, but that's not going to

14   be possible.

15         And so every correspondence you had just

16   because you would want a file of them is not going to be

17   possible for purposes of the case I don't think.  So if

18   there are particular things that relate to certain issues

19   or something like that, you can make them aware of it,

20   but we won't be able to totally recreate everything you

21   had.

22         But I am trying to make sure that you have

23   the things you need.  When I say "you," right now you

24   have counsel, and I am just going the extra step to work

25   with you directly around those issues, of course, with

1    your counsel's involvement.

2              But you know they are quite capable.  I

3    think you heard me say before as lawyers in the case they

4    haven't lost any materials.  They have the discovery,

5    which was provided by the Government, and so I am not

6    treating this as a case where all of the materials that

7    will be needed to defend you are gone.  I just want to be

8    clear about that.  That's not my view.

9              You know, the Government has -- we have got

10   experts that have been used, certain reports.  We have

11   got a lot of discovery, which has been made available to

12   the lawyers.  The lawyers have not lost in excess to any

13   of that.  So to the extent that those things need to be

14   reviewed with you for purposes of issues and trial,

15   that's still available.

16             So you know, I want you to be able to go

17   about your thinking about the case and gathering whatever

18   information you want, but I don't want to create the

19   impression that I think your case has gone down the tubes

20   because you don't have your notes.  I am trying to work

21   with that, so that you can have what you need to assist

22   your counsel in your defense.

23             And you have access to legal research at

24   Mahoning, right?

25             THE DEFENDANT:  Yes, your Honor.  I have

1    access to case law, but it took years to do all the

2    research that I have done.

3              THE COURT:  But I am not sure that all the

4    research you did is going to be translatable into

5    something you are just going to have to have for purposes

6    of defending yourself.  There are a lot of things you

7    looked into, a lot of thoughts and ideas you had.

8              Now, you are going to have to focus on what

9    are the issues before the Court and work with your

10   lawyers on getting the relevant information, and then you

11   do your research around that.

12             Don't go back trying to recreate everything

13   you had because I don't think that would be a good use

14   of time.  I think you have to be forward looking.

15             THE DEFENDANT:  I think there are still

16   issues though that in 2018, when I got the majority of

17   those discovery disks, I had taken notes thoroughly

18   analyzing the FBI reports, and I had notes from the only

19   two occasions I had to inspect my own laptop, and that

20   was six years ago.

21             I had based some of that on my own

22   recollections from the best I could, and now that's so

23   old.  And then, also, I have a potential issue where,

24   when I was only months in on this case, in part, as a

25   recommendation from my attorney at the time, I tried to

1    write out some lists of some relevant things from memory

2    before I'd forget, and these were things that might

3    be needed for trial or sentencing or for property

4    recovery.

5                    And so seven years later I don't think I can

6    recreate those lists to the extent that I was able to

7    back then.

8                    THE COURT:  All right.

9                    THE DEFENDANT:  Another issue along with my

10   notes, I would take meticulous notes of what's happening

11   in the case in order to preserve whatever might

12   eventually be relevant.

13                   So even if I do get a copy of whatever is

14   currently going on in the case or whatever is on the

15   docket, I can't recover the notes that I took from

16   discussions that have been had.

17                   So like after Court hearings, I would know

18   to keep things that were said in Court as well as when

19   talking with my lawyers before the hearing.  After every

20   single meeting with an attorney, I would document what

21   was done at the meeting and what was said.  And I would

22   try to star important details for later reference, but

23   now, I can't review past advice from attorneys going back

24   seven years and good or bad.

25                   So I don't even know if I can get a fair

1    appeal based on ineffective counsel now.

2            I have also -- I lost the notes that I took

3    during the various interviews I did with my parents early

4    on regarding the seizure of my laptop, which, in part,

5    formed our suppression motion, but those were based

6    entirely on recollections closer to the time.

7            THE COURT:  All right.  Let me -- and I

8    wanted you to be able to have the opportunity to talk

9    about the nature of the information that was there, and I

10   think you have given me a pretty broad picture of that,

11   conversations that you had with attorneys, information

12   you shared with your parents or those kinds of things.

13           You know, if you are going to appeal a case,

14   you would have a lawyer presumably -- maybe you

15   wouldn't -- on a case when they are looking at how other

16   lawyers performed on your behalf.  They will have a

17   record there.

18           It is not that you aren't important in terms

19   of a conversation with them, but they will have a legal

20   record to see what they did and whether it appears to be

21   reasonable in light of the whole record.

22           I understand your feeling about your notes

23   and your involvement in the case, and I can see that an

24   individual would be upset that they had lost the

25   materials they had, whether it was useful in the case or

1    not in the case, it could be, psychologically useful in

2    that sense.

3              So you were talking about a lot of things,

4    and we have got -- we talk about legal issues in a case.

5    A lot of the things you are talking about don't go

6    directly to legal issues, but I wanted to know about,

7    about your thinking.

8              We have clarified that there are a lot of

9    books and materials in your bags that were not relevant

10   to the case.  I don't mean that you are not upset about

11   them or that you are not justified being upset about

12   them.  But there are a lot of things.

13             And then there are these notes you kept

14   about your case, and I understand that, your concern

15   about those and notes you had with lawyers.  But what we

16   have to figure out now going forward since you do have

17   lawyers and we do have discovery and so forth, what is it

18   that is missing that is essential, if anything, that you

19   would need time to work on?

20             I don't see a need for delay in a case where

21   discovery is provided and where it is information that is

22   pertinent to the case that has been shared.  It is not

23   information in your possession.  It is your thought

24   processes, but mostly the information is not in that bag,

25   information, underlying information in existence.

1           So let me turn to Mr. Thompson.  I am not

2   sure we have any final answers here today, and we will

3   have to come back as soon as we receive that report from

4   the Bureau, but so we may need to delay somewhat, but go

5   ahead and give me any thoughts you have at this time.

6           MR. THOMPSON:  Your Honor, it is going to

7   take considerable work to get back to where we were.  I

8   would note the biggest concern I think is the notes that

9   Phil took related to the facts of the case.

10          He took those notes while viewing discovery,

11   talking with his lawyers, but he took them closer in time

12   to the incidents that he was remembering, but now, as he

13   correctly indicated, his memory is going to be somewhat

14   faded.

15          I don't know that that can be recovered, and

16   it is not -- these are not simple facts so to speak.  As

17   your Honor is probably well aware already it is going to

18   become painfully aware during the trial.

19          This is an incredibly complicated case of

20   incredibly complicated computer programs and

21   computer-related information.  Phil has an incredible

22   memory, but I don't know that there is any way to get

23   that back to where it was, that being that the notes he

24   took related to the specific programs and computers

25   accessed and so forth, what exactly was done, what

1     exactly was written, what exactly happened, I don't know

2     that he can -- we can get there.

3                THE COURT:  Let me stop you for a moment,

4     and I am not stopping you permanently.  You note he has

5     an incredible memory.  That was my impression, but I am

6     not here to draw that conclusion in an ultimate sense.

7                Second thing is, if he is talking about what

8     he told to lawyers and he doesn't remember the facts and

9     details that he told them and they are not as clear to

10    him now as then, we have got access to every single

11    lawyer that he had had, and if they have to be paid

12    through CJA or whatever, they will be.

13               MR. THOMPSON:  He also mentioned that, your

14    Honor.  But the thing that struck a cord with me that I

15    am most concerned about is not notes of what he said to

16    his lawyers, what his lawyers said to him so that he can

17    challenge the advice that was given to him on a 2255 or

18    something for ineffective assistance of counsel on direct

19    appeal or what not, it is the notes regarding what

20    happened in the case, notes regarding what he did or

21    didn't do in the case.

22               Like his recollection of events is now

23    dimmed by time.  He wrote stuff down on his lawyer's

24    advice, so that that dimming of by time wouldn't hurt him

25    if this case dragged on as it has because of the

1    complexity of it.  Those are the notes that worry me the

2    most.

3              I would also indicate, just as I see it --

4    and I have discussed this with Phil -- there is a number

5    of like some general issues.  I don't know what your

6    Honor's intention is on order of attack is -- we still

7    have Mr. Durachinsky's competency issue.

8              When I receive that, I will have to review

9    that with the expert I hired to determine whether or not

10   -- you know, what our position is, which might again be

11   contrary to Mr. Durachinsky's position, which is what led

12   him to issue number two, his pending appeal, and whether

13   or not that is something that needs to play out before or

14   during the continuing of the case at this level.

15             And number three, his request for new

16   counsel, which is something that is looming, and I think

17   the correct order that would be last, but I am not a

18   hundred percent certain of that.

19             I just offer for the Court like that seems

20   to be where I see us.

21             And finally, I would ask if Phil could be

22   permitted -- it would not take more than a couple minutes

23   -- for him to read the rest of what -- his recollections

24   of what those notes were so, there is a record of that.

25             Thank you.

1          THE COURT:  All right.  I thought we were

2     getting close to the end of that.  I have given him

3     quite a bit of time.  If he has got more, he needs to

4     condense it in a category because I have given him a lot

5     of time.

6          MR. THOMPSON:  He is very close, your Honor.

7          THE DEFENDANT:  All right.  One thing I

8     would just like to point out, recollections, my best

9     attempts to recall things related to facts for the case

10    came from 2017 and 2018 because that's when I was being

11    relayed information by my initial counsel as well as in

12    2018 when I was given those discovery disks.

13          Since then I haven't been given very much to

14    go on, and for the superseding indictment, I still

15    haven't been given a list of victims for those counts or

16    given a chance to inspect those computers.

17          THE COURT:  So you are talking about things

18    since that time?

19          THE DEFENDANT:  So I would have had to look

20    back on my notes to see what would have been relevant to

21    these new charges now.  Separate from that, I did want to

22    at least put on the record, although it is not

23    necessarily -- it doesn't necessarily prejudice the

24    outcome at trial -- but I just want to put on the record

25    some things about the personal prejudice caused by this.

1          So I had already mentioned that I had over

2     two years of an ongoing project related to collecting

3     stock data from newspapers working out equations --

4          THE COURT:  Okay.  Come on.  Hurry up with

5     that because --

6          THE DEFENDANT:  So I have been trying my

7     whole time locked up to try to use my time productively,

8     so that I would have my best chance when I got out.

9          I had a big long list of things that I've

10    tried, calculations based on it, and I wanted to be able

11    to show that to any potential employer or business

12    partner to show that I have experience.  A separate thing

13    that I worked on for about a year was related to

14    optimizing modular arithmetic.

15         THE COURT:  I am going to give you three

16    more minutes.

17         THE DEFENDANT:  All right.  And so with

18    that, I had come up with over hundreds of hours, various

19    techniques, which I believe were novel and which I wanted

20    to test when I got out and potentially to find a

21    professor to see if I could make some research papers out

22    of it or even do a Masters thesis.

23         I have spent thousands of hours with

24    newspapers, my books, and podcasts, and so I had lists of

25    ideas of things to look into when I get out, list of

1   investing ideas, references for things to investigate

2   because I wanted to use that time to do the brainstorming

3   so that I would have lots of things to look into when I

4   got out.

5          I have lost the dates and copies of medical

6   events and grievances, which may be impair future civil

7   suits.  I lost my personal correspondences with friends

8   early on who since become too busy to stay in touch.

9          It was suggested early on that I should

10  write a book about my experience, and I had notes of

11  interesting events and mundane anecdotes as well as

12  contact info of people I have met throughout the years.

13         But I can't get that back.

14         And so I just wanted to give you some idea

15  of how I have tried to stay productive locked up and how

16  this basically took away seven years of my work.

17         THE COURT:  I respect that, and I do

18  understand.  I can't totally understand how another

19  person feels because I am not the other person, but I

20  think I have a glimpse into how you might feel with

21  losing all those things that you worked on and not having

22  them.

23         That I understand.  Maybe I don't understand

24  it like you feel it, but it is frustrating to say the

25  least.  And I understand that.

```
 1              I am trying to concentrate on the case, not
 2   because I don't care about the rest of it, but because
 3   that's the part that I have in my hands.  I am going to
 4   see if Mr. Shepherd has any comments you want to make,
 5   statements or anything else?
 6              MR. SHEPHERD:  Your Honor, the only thing I
 7   would state is, I believe it is probably too soon to tell
 8   the ultimate impact on the case, and we will have to wait
 9   for Mr. Thompson to continue to figure that out.
10              I would say I do agree with Mr. Thompson, he
11   referred to the pending appeal in this case, and I guess
12   with my comment on that is, my initial take on that is,
13   although I would have to do a little further research, is
14   that until that is resolved it may very well divest the
15   Court of jurisdiction over the ultimate competency
16   finding in this case because it relates to an appeal of
17   the Court's order from December, so --
18              THE COURT:  What is he appealing, what is
19   being appealed?
20              MR. SHEPHERD:  He appealed the Court's
21   December order committing him for restoration of
22   competency to the custody of the Attorney General.  That
23   is still pending.  His brief has been filed.  The
24   Government's brief is due later this month, and then the
25   Sixth Circuit will have to consider that issue and rule
```

1    on it.

2            So I just -- I bring that in agreement with

3    Mr. Thompson -- bring that to the Court's attention in

4    terms of procedure going forward once -- even when the

5    Court -- I guess we would have to get back to the Court

6    -- excuse me -- I believe what I would suggest is this:

7            I will confer with Mr. Thompson while we are

8    waiting for the report about the impact, what we believe

9    the impact, if any, is on that pending appeal, and then

10   we can report to the Court whether there is a

11   jurisdictional issue for the Court to move forward before

12   the appeal is resolved, your Honor.

13           THE COURT:  I agree that we should come back

14   after the report comes in, and we can assess all the

15   relevant issues at that time, and it may be that the

16   appeal is pending.

17           It doesn't mean that we necessarily have to

18   completely stop what we are doing.  We can work toward

19   being organized to move forward should the Court rule

20   against him.  If they rule in his favor, then, of course,

21   that's a different matter.

22           MR. SHEPHERD:  Yes, your Honor.  And I think

23   issues like today that deal with sort of the, I guess,

24   administration of the conditions of his pretrial

25   detention, we don't believe there is any issue with the

1    Court continuing to resolve these matters and deal with

2    these matters.  It would just be a competency issue that

3    we would need to research further when we all come back

4    together next and discuss further as you suggested, your

5    Honor.

6                    THE COURT:  All right.  Is there anything

7    further?

8                    MR. THOMPSON:  Your Honor, if I could just

9    add one more thing from what's missing, Mr. Durachinsky

10   indicates that he had notes related to his assessment by

11   Dr. McConnell.  That's the forensic psychologist who we

12   retained to have him evaluated.

13                   The notes were related to certain questions

14   that Mr. McConnell asked, the way he asked them, and the

15   way that Phil responded, and Mr. Durachinsky feels that

16   those notes would be useful going forward in litigation

17   related to his competence.

18                   Thank you.

19                   THE DEFENDANT:  (Nodding affirmatively.)

20                   THE COURT:  He has a got a copy of the

21   report though?

22                   MR. THOMPSON:  I don't know that I have ever

23   sent him a copy of the report.  Do you have a copy of the

24   report?

25                   THE DEFENDANT:  I do have a copy of the

1    report, but he didn't go into detail over really how the

2    questions were asked.

3                    THE COURT:  I understand the point

4    Mr. Thompson made.  I just want to say, you got a copy of

5    the report?

6                    THE DEFENDANT:  I do.  Well, I do

7    not currently because it was destroyed but I could

8    get --

9                    THE COURT:  We can get a copy of it.  We can

10   get a copy of the report, and then, you know, you will

11   have it.  All right?  That's all we have.  That's all.

12                    (Hearing concluded at 11:25 a.m.)

13                        - - - - -

14                   C E R T I F I C A T E

15                    I, George J. Staiduhar, Official Court

16   Reporter in and for the United States District Court,

17   for the Northern District of Ohio, Eastern Division,

18   do hereby certify that the foregoing is a true

19   and correct transcript of the proceedings herein.

20                    s/George J. Staiduhar
                     George J. Staiduhar,
21

22                    Official Court Reporter
                     U.S. District Court
23                    801 W. Superior Ave., Suite 7-184
                     Cleveland, Ohio 44113
24                    (216) 357-7128

25